**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**REBECCA KAPP,**

      **Plaintiff,**

                                    **Civil Action 2:16-cv-222**
                                    **Chief Magistrate Judge Elizabeth P. Deavers**

  **v.**

**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

## OPINION AND ORDER

Plaintiff, Rebecca Kapp, brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for social security disability insurance benefits. This matter is before the Court for disposition based upon the parties' full consent (ECF No. 4) and for consideration of Plaintiff's Statement of Errors (ECF No. 19), the Commissioner's Memorandum in Opposition (ECF No. 24), and the administrative record (ECF No. 8). For the reasons that follow, the Court **OVERRULES** Plaintiff's Statement of Errors and **AFFIRMS** the Commissioner's decision.

## I.    BACKGROUND

Plaintiff filed her application for benefits on October 2, 2013, alleging that she has been disabled since October 9, 2011, due to a foot injury, fibromyalgia, depression, high blood pressure, osteoporosis, and strokes. (R. at 208-09, 228.) Plaintiff's application was denied initially and upon reconsideration. Plaintiff sought a *de novo* hearing before an administrative law judge. Administrative Law Judge Katie H. Pierce ("ALJ") held a hearing on November 10, 2014, at which Plaintiff, represented by counsel, appeared and testified. (R. at 65-82.) Sheila Justice, a vocational expert, also appeared and testified at the hearing. (R. at 82–87.) The ALJ

held a supplemental video hearing on March 4, 2015, at which Jody Skinner appeared and testified as a vocational expert. (R. at 42-55.) On March 25, 2015, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 14-26.) On January 7, 2016, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1-6.) Plaintiff then timely commenced the instant action.

## II. HEARING TESTIMONY

### A. Plaintiff's Testimony

Plaintiff testified at the November 10, 2014 administrative hearing that she last worked as a restaurant manager in 2009. (R. at 65.) She said that she could no longer perform that job because it requires her to be on her feet for 17 hours a day. (*Id.*) Plaintiff stated that "standing still for five minutes is painful." (R. at 66.) She added that she also has trouble sitting due to the pain in her right leg and foot, explaining that she needs to keep readjusting because of shooting pain down the back of her leg and swelling in her knee and foot. (R. at 66-67.) Plaintiff testified that elevating her leg above her chest or at least her waist makes the pain tolerable. (R. at 67.) She estimated that she can be on her feet for four or five minutes before she has to lean on a wall. (R. at 70.) She indicated that she had driven once recently and that "it wasn't pleasant." She explained that putting pressure on the gas pedal hurt the top of her foot. (R. at 71.) Plaintiff estimated that she could sit for 20-30 minutes while elevating her leg before she would have to lay down and elevate her legs. (R. at 113.)

When asked about other problems she was experiencing, Plaintiff testified that that she found it difficult to concentrate and that she has confusion and insomnia due to her medications.

2

(R. at 69-70.)  She noted that when she tries to read a book, she has to read the same page four times and does not know what she just read.  (R. at 70.)

Plaintiff also testified that she has had two strokes.  (R. at 71-72.)  She stated that she was unable to further her education after suffering the second stroke.  (R. at 73-74, 76-77.)  The ALJ noted during the hearing that the evidentiary record contains no actual diagnosis of either condition by a medical professional.  (R. at 75.)

Plaintiff next testified that orthopaedic physician Dr. Goldman had recommended a cane. She said that she did not yet have one, but was contacting her insurance company to find out if any of the cost would be covered.  (R. at 77.)

Plaintiff described a typical day as staying in her bed with her legs elevated and sometimes taking a hot bath.  (R. at 78.)  She added that her children come into her bed with her to watch a movie and play games because she is no longer able to go outside and run with them. (R. at 78-79.)  Plaintiff indicated that her husband and children perform all of the household chores.  (R. at 80.)

During the March 4, 2015 administrative hearing, Plaintiff testified that Dr. Goldman referred her to a pain management physician.  She said that she was only able to see him twice because she moved to Ohio.  Plaintiff said that the pain management specialist recommended trying SI joint injections to address her pain.  (R. at 41-42.)

**B.	Vocational Expert Testimony**

Jody Skinner testified as the vocational expert ("VE") at the March 4, 2015 hearing.  (R. at 42-55.)  The VE testified that Plaintiff's past relevant work included a restaurant manager,

3

light exertion, but performed at the medium exertional, skilled level; and a waitress/server, a light, semi-skilled position. (R. at 43-44.)

The ALJ proposed a series of hypothetical questions regarding a hypothetical individual with Plaintiff's age, education, and work experience. (R. at 44-47.) The VE testified that such an individual with the residual functional capacity ("RFC") the ALJ ultimately assessed for Plaintiff could not perform her past employment. Such an individual could, however, perform over 372,000 sedentary jobs in the national economy, including the representative jobs of assembler, surveillance system monitor, and addresser. (R. at 46.) The VE testified that her testimony does not conflict with the Dictionary of Occupational Titles ("DOT") with the exception of the sit-stand option, as well as raising the leg and foot to waist height. (R. at 47.)

### III.    MEDICAL RECORDS

**A.    Physical Impairments**

**1.    Thomas Hospital**

In April 2010, Plaintiff presented to the emergency room with complaints of paresthesia and muscle weakness. She was observed to have her neck in a torticollis/spasm-type position and was diagnosed with hypokalemia. Plaintiff was given medication and discharged. (R. at 293-95.)

In August 2010, Plaintiff again presented to the emergency room with complaints of altered sensation in her upper face and occipital headaches, which she said she had been experiencing for the past two weeks. (R. at 303.) Sensory examination in Plaintiff's upper extremity showed variably decreased touch in her right upper extremity, varying between her proximal and distal arm and hand. When double simultaneous testing was performed, Plaintiff

4

denied being able to feel the isolated right-sided stimulus, but was able to perceive the isolated

left-sided stimulus.  She was also able to perceive bilateral stimuli.  Plaintiff's muscle tone was

good, although voluntary strength testing showed decreased response.  Her reflexes were 2/4 in

both upper extremities, 2/4 at the knees, and 2/4 at the ankles.  Plaintiff's toe signs were

downgoing.  (R. at 305.)  Diagnostic testing, including an electroencephalogram, CTA of the

head, CT of the head, and MRI of the brain, were found to be normal.  (R. at 300, 320, 324-26.)

Plaintiff's chest x-ray's revealed right basilar atelectasis.  (R. at 321.)  ECG testing revealed

sinus tachycardia with non-specific ST abnormality.  (R. at 302.)  A physical therapist noted that

Plaintiff walked with slow, deliberate steps that were unsteady in nature.  (R. at 327-28.)

Plaintiff was diagnosed with acute right sided hemiparesis secondary to a conversion disorder

and told she would need outpatient psychiatry.  (R. at 308.)

      In November 2010, Plaintiff again presented to the emergency room with complaints that

her muscles were drawing.  Plaintiff was observed to have an unsteady gait.  CT testing of her

head was normal.  Plaintiff was diagnosed with hypokalemia.  (R. at 296-99.)

      In July 2012, Plaintiff was seen in the emergency room for a lumbar back strain.  She was

prescribed Flexeril and Lortab.  (R. at 704-05.)

      In February 2013, Plaintiff returned to the emergency room for ankle pain caused by

turning her ankle while running.  X-testing of her right foot revealed a 4th metatarsal

nondisplaced fracture.  Plaintiff was given a splint.  (R. at 598-99.)

      On March 1, 2013, Plaintiff saw orthopaedist Robert Baird, III, M.D., in follow up for her

foot fracture.  Dr. Baird opined that the x-rays of Plaintiff's right foot revealed minimally

displaced fractures of her 3rd and 4th metatarsals, as well as a possible lisfranc injury.  Dr. Baird

recommended a short leg cast and non-weight bearing to treat Plaintiff's foot fractures. (R. at 757.)

On June 14, 2013, Plaintiff presented to the emergency room complaining of right foot pain. She reported that she broke her foot 4 months ago and has had cast placement times 2 with subsequent foot immobilizer. Plaintiff was started on partial weight bearing a week-and-a-half prior. The day prior, she was making dinner and turned while under crutches, kicking her right foot into her crutch. She stated that she heard a pop and felt instant pain. She reported having more pain and swelling since the injury and that she could not bear weight without pain. Plaintiff rated her pain severity at a level of 7 on a 0-10 visual analog scale, adding that it worsened with movement and was better with rest. (R. at 568.) X-rays of her right ankle and foot revealed osteopenia. (R. at 562-63.) Plaintiff was diagnosed with right foot pain and a contusion. (R. at 570.)

On October 5, 2013, Plaintiff received x-ray and CT testing of her right knee that revealed a medial tibial plateau fracture due to a fall. (R. at 777-78.)

### 2. Barbara Corcoran, M.D.

Plaintiff treated with primary care physician Dr. Corcoran from September 2010 through at least September 2014. (R. at 376-91, 726-49, 771-804.)

When seen on September 2, 2010, for stroke follow-up, it was noted that Plaintiff started smoking at age 13 and drank 6-7 sodas per day. (R. at 376.) On examination, Plaintiff was found to have decreased sensation in her fingers on her right hand and also in her right leg. (R. at 377.) Plaintiff was assessed with a transient ischemic attack (TIA), NOS, hypertension, and

depression. (*Id.*) Plaintiff was advised to exercise more and to stop drinking alcohol and smoking. (R. at 378.)

After Plaintiff fractured her foot in March 2013, Dr. Corcoran noted that x-rays revealed significant osteoporotic-appearing bones in her right foot. She applied a cast to Plaintiff's right lower extremity and restricted her to no weight-bearing. (R. at 727-28.)

X-rays taken of Plaintiff's right foot on May 1, 2013, showed severe disuse osteoporosis of her foot and mild irregularity of her proximal 5th metatarsal, suspicious for underlying fracture. (R. at 749.) Repeat x-ray testing was performed on May 16, 2013, as a companion to the prior images, because Plaintiff had significant motion with reduced diagnostic quality. This x-ray revealed a third metatarsal insufficiency fracture and severe disuse osteoporosis. (R. at 742.) On May 24, 2013, Plaintiff underwent a DEXA bone density study, which revealed osteoporosis of her lumbar spine and osteopenia of her right femoral neck and hips. (R. at 736-38.)

On July 23, 2013, Plaintiff reported that she had been ambulating with crutches since February 2013 and that she was still unable to put pressure on her foot. She added that if she stands too long it swells and hurts. (R. at 732.) Plaintiff exhibited tenderness on palpitation of her right foot. Plaintiff was prescribed Alendronate and hydrocodone and instructed to continue her weight bearing exercises. (R. at 733.) Dr. Corcoran assessed osteoporosis, osteopenia, hypertension, depression, and tobacco abuse. (*Id.*)

In January 2014, Plaintiff reported that she had been experiencing palpitations with her pulse escalating up to 118. She reported that she "feels like she wants to rip her skin off/lots of stress going on in life." Plaintiff indicated that she had felt like this for the past 2 weeks. She

7

also reported that she had been drinking 5 cans of diet Pepsi and water. Dehydration was discussed, and Plaintiff's medications were adjusted. (R. at 788-90.)

In July 2014, Plaintiff reported that her knee/foot began to swell when she tried going back to work. On examination, the nurse practitioner found mild crepitus in Plaintiff's right knee. (R. at 802.)

### 3. Dawn Kidd, D.O.

On May 4, 2011, Plaintiff was examined by Dr. Kidd for disability purposes. (R. at 401-04.) Plaintiff reported that she was seeking disability due to multiple sclerosis ("MS"). She indicated that she had been diagnosed with MS in 2000 and had showed some symptoms in her arms and legs. Plaintiff believed that her CT scans and MRIs were normal. On examination, Plaintiff showed very different sensation on her right versus her left side, could not feel soft touch on the left, and showed decreased reflexes. The remainder of Plaintiff's examination was normal, showing a normal range of motion throughout, negative straight-leg raise testing, and a gait within normal limits. Dr. Kidd assessed hypertension, depression, and multiple sclerosis "just from history." Dr. Kidd offered no functional limitations. (R. at 402.)

### 4. Ohio State University

On July 14, 2011, Plaintiff presented to Fairfield Medical Center with right-leg pain and right-arm numbness. Throughout the examination, Plaintiff showed worsening right-sided weakness. A CT scan did not show any acute bleeding or any signs of stroke. Plaintiff was med-flighted from Fairfield Medical Center to Ohio State University for further management and testing. Before being given tPA stroke medication, Plaintiff's NIH stroke scale was 10, but after

8

arrival at OSU, Plaintiff's NIH stroke scale[1] was 18. Plaintiff's neurological examination upon arrival revealed right-lower facial droop. She was able to raise her forehead and close her eyes. Plaintiff exhibited 1/5 strength in her right arm and right leg. Plaintiff's strength on her left side was 5/5 in her shoulders, biceps, triceps, right-sided iliopsoas, quadriceps, and hamstrings. Plaintiff displayed obvious sensory deficit, but had no cerebellar deficit on her left hand. She had a hard time generating words, but did appear to understand the questions that were asked. Diagnostic testing including an MRI of the brain, cerebral perfusion study, and a transthoracic echo, all of which revealed normal findings. Plaintiff was discharged the following day with the diagnosis of rule out ischemic stroke. (R. at 848-901.)

### 5. Matthew W. Goldman, M.D.

Plaintiff initially treated with orthopaedist Dr. Goldman on October 7, 2013, for her right knee injury. Dr. Goldman noted that Plaintiff went to Thomas Emergency Room four days prior after a fall. His treatment notes stated as follows: "She fell directly on her right knee. She is actually a more complicated story where she had a fourth metatarsal fracture. She was treated in a cast for eight weeks and then progressed with her weight bearing. It has actually been eight months that she has been on crutches. She has just recently weaned from her crutches and fell on that right leg suffering a tibial plateau fracture." On examination, Dr. Goldman observed that Plaintiff had a tense and palpable effusion of her right knee, but was neurovascularly intact

---

[1]The NIH stroke scale systematic assessment tool provides a quantitative measure of stroke-related neurologic deficit. A score of 10 equals "mild to moderately severe," and 18 falls in the "severe" range. https://www.ncbi.nlm.nih.gov/pubmed/15225452; http://www.rehabmeasures.org/Lists/RehabMeasures/DispForm.aspx?ID=914

distally to the toes.  (Tr. 828.)  X-rays showed a non-displaced medial plateau fracture.  (*Id.*)  Dr. Goldman immobilized her right leg.  (*Id.*)

Plaintiff returned on October 28, 2013.  Dr. Goldman noted that Plaintiff had "not worked on range of motion" of her right knee.  He instructed Plaintiff to begin range of motion exercises and physical therapy, noting that Plaintiff "refused a referral to physical therapy and will do it with her friend" who was she said was a physical therapist.  (R. at 827.)

In November 2013, Dr. Goldman noted that Plaintiff was eight weeks post tibial fracture. He recommended that Plaintiff start physical therapy.  (R. at 825.)

In August 2014, Plaintiff returned to Dr. Goldman complaining that she had not made much progress with her leg.  X-rays of Plaintiff's right leg showed disuse osteopenia, with no sign of fracture and good healing from the previous x-rays.  Dr. Goldman referred Plaintiff to physical therapy to improve range of motion, strengthening, and stretching of the right lower extremity.  (R. at 823.)

Plaintiff attended six physical therapy sessions between August 19, 2014 and September 23, 2014.  (R. at 809-14, 816, 821-22). Following her sessions, Plaintiff exhibited a better range of motion and strength.  (*Id.*)  After September 23, 2014, Plaintiff either canceled or did not show up for the remainder of her physical therapy sessions.  (R. at 805-08.)

On October 27, 2014, Dr. Goldman completed a physical functional capacity questionnaire in which he opined that Plaintiff could sit 8 hours in an 8-hour day; stand and walk 1 hour of an 8-hour day; lift and carry up to twenty pounds occasionally; frequently push/pull; never squat, crawl, or climb; occasionally bend; frequently reach; never be around unprotected heights or moving machinery; occasionally drive; frequently be around temperature changes,

10

dust, fumes and gases; and constantly use her hands to grasp and perform fine manipulation and handling. (R. at 837-39.)

That same day, October 27, 2014, Dr. Goldman also completed a pain assessment form in which he circled boxes reflecting his opinion that Plaintiff's pain would distract her from adequately performing her daily activities and/or work activities; walking, standing, bending, and stooping, and moving of extremities would greatly increase her pain to such a degree as to cause distraction from task or total abandonment to task; she would have significant side effects from her medications which may be expected to limit the effectiveness of work performance of everyday tasks, e.g. driving; pain and/or drug side effects can be expected to be severe and to limit effectiveness due to distraction, inattentiveness, drowsiness, etc., frequency; her degree of pain should diminish to an insignificant level but will still be present; and that treatment for pain has been used quite successfully. (R. at 845-46.)

On November 12, 2014, Plaintiff presented to Dr. Goldman to "discuss . . . mainly" her disability paperwork. He informed her that he completed the forms on October 27, 2014, to the best of his ability. Dr. Goldman stated that his "repeat discussion" changes "somewhat" the findings he made two weeks prior. He explained as follows:

> At the last visit, I filled out that she was able to sit up to eight hours at a time, and up to eight hours a day, with standing and walking about an hour. She states that is impossible for her to do. She is actually in tears here today and shaking, and saying that sitting up for any period of time causes significant pain, and she is unable to concentrate on her duties. In regard to her exertional limitations it appears that she is unable to perform at the level I had quoted previously.
>
> In regard to exertional limitations, as a question sent to me by the disability attorney, total sitting at one time would be two to three hours with what she says is having to elevate that leg in a semi-flexed recumbent position to help

11

relieve the pain.  She would require that at least 2 or 3x over an 8-hour day per her subjective findings.

> In regard to the fractures of the knee and foot, the appear to be well healed at this point.  The only further management of this would include physical therapy and continuing to progress her activities due to the significant amount of pain that she is currently in and crying and shaking that she is undergoing with even sitting for a short period of time.  I am going to send her to a pain management doctor to see if there is something they can do with regard to medication versus injection therapy and have them evaluate her.  I will see her back as symptoms dictate in the future.

(R. at 847).

### 6.    State-Agency Evaluation

On October 15, 2013, single-decision maker C. Finch reviewed the record and opined that Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently; stand and/or walk about six hours in a workday; and sit for about six hours in a workday.  (R. at 97.) Mr. Finch found no other limitations.  (*Id.*)  Mr. Finch found Plaintiff's allegations partially credible.  (R. at 96.)

### B.    Mental Impairments

### 1.    Kendra Laconsay, Ph.D.

In April 2011, Plaintiff was evaluated by Dr. Laconsay for disability purposes.  (R. at 393-99.)  Plaintiff reported feeling sad all of the time, explaining that her life had drastically changed since her August 2010 stroke.  When discussing Plaintiff's concentration and attention, Dr. Laconsay found that Plaintiff's performance on tasks was not consistent with her level of education and work history and represents the residual effects of the stroke she suffered the prior year.  (R. at 396.)  As to Plaintiff's judgment and insight, Dr. Laconsay stated that Plaintiff would not likely handle the social demands of a work setting, would likely become overwhelmed

quickly, and would be vulnerable to verbally lashing out at others and shutting down in her efforts. (R. at 397.) Dr. Laconsay diagnosed Plaintiff with a conversion disorder with mixed presentation and assigned a Global Assessment of Functioning Score of 45. (R. at 398.) Dr. Laconsay opined that it was questionable whether Plaintiff could return to work, noting that it was highly dependent upon the stabilization of her medical and psychiatric problems. She further noted that Plaintiff would certainly benefit from interventions to address her anxiety, depression, and pain. (*Id.*)

### 2. Kimberly Whitchard, Ph.D.

On October 7, 2013, Plaintiff was evaluated for disability purposes by Dr. Whitchard. (R. at 751-56.) Plaintiff reported that she was filing for disability due to physical issues, but also because of symptoms of depression, including crying spells, poor concentration, irritability, social isolation, appetite disturbance, feelings of helplessness, and sleep disturbance with initial insomnia. (R. at 751.) On mental status examination, Dr. Whitchard found Plaintiff's mood was depressed, but that she was cooperative and fully oriented with normal behavior and thought processes. Dr. Witchard indicated that Plaintiff was unable to perform serial sevens, but was able to perform serial fours, calculate two of three multiplication questions, and calculate two of two simple word problems. (R. at 753.) Memory testing reflected Plaintiff's ability to recall seven digits forward and four backwards, as well as the ability to identify an object and recall it after five minutes. Plaintiff was also able to recall what she had done within the last 24 hours and remember significant, remote dates and birth dates. Dr. Whitchard diagnosed Plaintiff with major depression, dysthymia, and generalized anxiety disorder. Dr. Whitchard did not assess any functional limitations. (R. at 754.)

13

### 3.    Christine Aiken, Ph.D.

On December 30, 2014, Plaintiff underwent a pain psychology evaluation with Dr.
Aiken.  Plaintiff complained of constant pain since 2013, when she broke her foot and
fractured her right tibial plateau, representing that her pain had not been relieved with physical
therapy or chiropractic treatment.  Plaintiff also reported having trouble sleeping and difficulty
concentrating.  She stated that she takes her pain medication as little as possible because it "loops
you up."  Psychometric testing demonstrated low-average intellectual abilities with slowed
processing speed, possibly due to pain.  Plaintiff's attention, memory, and language were all in
the average range.  She also scored in the average range on overall measures of depression and
anxiety.  Dr. Aiken noted that despite reports of difficulties with concentration, there was no
obvious sign of cognitive disturbance during the clinical interview.  Dr. Aiken found that
Plaintiff's thought process was logical and goal directed and concluded that her speech was
within normal limits.  Dr. Aiken indicated that testing results indicated the presence of some
depression and anxiety symptoms, particularly in relation to pain and life stressors.  Dr. Aiken
concluded that Plaintiff would be a good candidate for cognitive behavioral therapy.  (R. at 902-
04.)

### 4.    State-Agency Evaluations

On October 15, 2013, after review of Plaintiff's medical record, Donald E. Hinton Ph.D.,
a state-agency psychologist, assessed Plaintiff's mental condition and opined that she had mild
restrictions in her activities of daily living; mild difficulties in maintaining social functioning and
in maintaining concentration, persistence, or pace; and no episodes of decompensation of an

extended duration.  (R. at 95-96.)  He further determined that the evidence did not establish the

presence of the "C" criteria.  (*Id.*)

## IV.    THE ADMINISTRATIVE DECISION

On March 25, 2015, the ALJ issued her decision.  (R. at 14-26.)  The ALJ found that

Plaintiff met the insured status requirements of the Social Security Act through September 30,

2015.  (R. at 16.)  At step one of the sequential evaluation process,[2] the ALJ found that Plaintiff

had not engaged in substantially gainful activity since her alleged onset date of October 9, 2011.

(*Id.*)  The ALJ concluded that Plaintiff had the severe impairments of major depressive disorder,

dysthymia, generalized anxiety disorder, conversion disorder, hypertension, and disuse

osteoporosis of the right foot status post tibial plateau fracture.  (*Id.*)  The ALJ also found that

Plaintiff's status post possible ischemic stroke was not a severe impairment because it did not

---

[2]  Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. § 404.1520(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.    Is the claimant engaged in substantial gainful activity?
2.    Does the claimant suffer from one or more severe impairments?
3.    Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.    Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5.    Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

15

cause more than a minimal limitation in her ability to perform basic work activity. (R. at 16-17.) She further found that there is insufficient evidence on the record to consider Plaintiff's multiple sclerosis and myofascial syndrome as medically determinable impairments. (R. at 17.)

The ALJ next concluded that that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*) The ALJ indicated that she had specifically considered Listings 1.02, 12.04, and 12.06.

At step four of the sequential process, the ALJ set forth Plaintiff's RFC as follows:

> After careful consideration of the entire record, the [ALJ] finds that the [Plaintiff] has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she is able to understand to carry out detailed but uninvolved written or oral instructions involving a few concrete variables in or from standardized situations. She can have occasional contact with the public and occasionally adapt to minimal changes in the work setting. She is able to maintain attention and concentration for up to two hours at a time. She should never kneel, crouch, or crawl, but can occasionally stoop and climb ramps and stairs. She can never push or pull foot pedals or leg controls and should never work at unprotected heights, around hazardous machinery, operate automotive equipment, or climb ladders, ropes or scaffolds. She must be able to elevate her right foot to waist height during regularly scheduled breaks and meal periods. Finally, she must be able to sit for two to three hours at a time, and then would require a change of position for at least 10 minutes before returning to a seated position; her work would continue through the position change.

(R. at 19.) In reaching this RFC determination, the ALJ assigned "great weight" to Dr. Goldman's opinions, concluding that they were supported by the examination findings and consistent with an RFC for a reduced range of sedentary work. (R. at 22.) Citing Dr. Goldman's Novmeber 12, 2014 letter, the ALJ stated that he included an RFC limitation to account for Plaintiff's subjective need to elevate her foot to waist level two-to-three times a day during regularly scheduled breaks and meal periods. (*Id.*) The ALJ further explained that the sit/stand

16

option he included in the RFC, which allows Plaintiff to sit for two-to-three hours at a time and change position for at least ten minutes with work continuing through the position change, is also supported by Dr. Goldman's November 2014 letter and Plaintiff's subjective complaints of ongoing pain.  (*Id.*)

In assessing Plaintiff's mental RFC, the ALJ relied upon the evaluations of Drs. Whitchard and Aiken.  (R. at 23-24.)  The ALJ assigned less weight to the Dr. LaConsay's findings, explaining that they are inconsistent with the medical evidence of record as a whole. (R. at 24.)

Relying on the VE's testimony, the ALJ determined that even though Plaintiff is unable to perform her past relevant work, other jobs exist in the national economy that she can perform. (R. at 25-26.)  The ALJ therefore concluded that Plaintiff was not disabled under the Social Security Act.  (R. at 26.)

## V.   STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

17

Although the substantial evidence standard is deferential, it is not trivial.  The Court must

"'take into account whatever in the record fairly detracts from [the] weight'" of the

Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial

evidence supports the ALJ's decision, this Court defers to that finding 'even if there is

substantial evidence in the record that would have supported an opposite conclusion.'"  *Blakley

v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.

1997)).  Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision

of the Commissioner will not be upheld where the SSA fails to follow its own regulations and

where that error prejudices a claimant on the merits or deprives the claimant of a substantial

right.'"  *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746

(6th Cir. 2007)).

## VI.    ANALYSIS

Plaintiff advances three contentions of error.  First, Plaintiff maintains that the ALJ failed

to properly consider Dr. Goldman's opinions.  Second, Plaintiff contends that the ALJ erred in

evaluating her allegations of pain.  Finally, Plaintiff asserts that the ALJ's determination that her

conversion disorder does not meet or equal Listing 12.07 is not supported by substantial

evidence.  The Court considers these contentions of error in turn.

### A.    The ALJ's Evaluation of Dr. Goldman's Opinions

The Undersigned finds Plaintiff's challenges to the ALJ's consideration and weighing of

Dr. Goldman's opinions to be without merit.

The ALJ must consider all medical opinions that he or she receives in evaluating a

claimant's case. 20 C.F.R. § 416.927(c). The applicable regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(2).

The ALJ generally gives deference to the opinions of a treating source "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical filings alone . . ." 20 C.F.R. § 416.927(c)(2); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009). If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight." 20 C.F.R. § 404.1527(c)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors-namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source-in determining what weight to give the opinion.

*Id*. Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion." 20 C.F.R. §

19

416.927(c)(2).  Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010) (internal quotation omitted).  The United States Court of Appeals for the Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45.  Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242). There is no requirement, however, that the ALJ "expressly" consider each of the *Wilson* factors within the written decision.  *See Tilley v. Comm'r of Soc. Sec.*, 394 F. App'x 216, 222 (6th Cir. 2010) (indicating that, under *Blakley* and the good reason rule, an ALJ is not required to explicitly address all of the six factors within 20 C.F.R. § 404.1527(c)(2) for weighing medical opinion evidence within the written decision).

Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity.  20 C.F.R. § 404.1527(d).  Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special

20

significance. 20 C.F.R. § 404.1527(d); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

Here, the ALJ considered and discussed Dr. Goldman's opinions and assigned them "great weight," reasoning that the opinions were "supported by examination findings and consistent with a residual functional capacity for a reduced range of sedentary work." (R. at 22.) Notwithstanding according his opinions great weight, the ALJ found Plaintiff to be *more* restricted than Dr. Goldman opined in several regards. For example, the ALJ limited Plaintiff to "no kneeling, crouching, or crawling, which accounts from the claimant's knee pain," "no pushing or pulling of foot pedals or leg controls with the bilateral lower extremities," and "no operating automotive equipment." (*Id.*) The ALJ also incorporated the additional limitations set forth in Dr. Goldman's revised November 2014 opinion. Specifically, the ALJ included a limitation to address Plaintiff's "subjective findings" that she reported to Dr. Goldman, namely, that she needed to elevate her leg two or three times per day over an eight-hour day. The ALJ found Plaintiff to be less restricted only in regards to her ability to utilize her upper extremities, reasoning as follows:

> Although Dr. Goldman limited the claimant to frequent reaching, pushing, and pulling with the bilateral upper extremities, the undersigned has not included these limitations in the residual functional capacity, as the objective evidence does not show any complaints of pain or physical limitations relating to the neck or upper extremities.

(*Id.*)

Plaintiff maintains that the ALJ "seems to only focus on [Dr. Goldman's] thoughts that treatment should be able to cure the pain" and that her "pain would eventually resolve with medical treatment and that treatment has been successful in lessening Plaintiff's degree of pain." (Pl.'s Statement of Errors 13-14, ECF No. 19.) Plaintiff's also posits that the ALJ "did not focus

21

on the most recent and most valuable opinion" from November 12, 2014.  (*Id.* at 14.)  She

concludes that "[t]he ALJ erred in simply presuming that [Plaintiff's] pain was controlled . . . ."

(*Id.* at 15.)

Contrary to Plaintiff's assertions, the ALJ did not focus solely on Dr. Goldman's

opinions that Plaintiff's pain could be resolved or that treatment had been successful in lessening

the pain.  Rather, the ALJ thoroughly considered the entirety of the opinions Dr. Goldman

rendered in both the pain assessment form and also his November 12, 2014 letter.  Specifically,

the ALJ offered the following discussion of the opinions at issue:

> Dr. Goldman also completed a pain assessment form indicating that the
> claimant's pain is present to such an extent as to be distracting to adequate
> performance of daily activities and/or work.  Furthermore, he noted that physical
> activities such as walking, standing, bending, stooping, and moving of the
> extremities greatly increases the claimant's pain to such a degree as to cause
> distraction from task or total abandonment of tasks; significant medication side
> effects may be expected, which may limit the effectiveness of work performance;
> and pain and or drug side effects can be expected to be severe and to limit
> effectiveness due to distraction, inattentiveness, and drowsiness.  Nevertheless,
> with respect to the claimant's long term prospects for recovery, Dr. Goldman
> found that the frequency and degree of pain should diminish to an insignificant
> level, but will still be present, and that in this case, treatment has been quite
> successful in lessening the claimant's degree of pain.
>
> Thereafter, in a letter dated November 12, 2014, Dr. Goldman indicated
> that the claimant is unable to perform at the exertional level assessed in October
> 2014.  Specifically, Dr. Goldman opined that the claimant can only sit for two to
> three hours at a time, with what she says is having to elevate her right leg in a
> semi-flexed recumbent position to help relieve the pain, and that she would
> require this elevation at least two to three times over an eight hour day per her
> subjective findings.

(R. at 21-22 (internal citations to the record omitted).)  Further, the ALJ did not, as Plaintiff

suggests, "assume Plaintiff's pain was controlled," but instead included both mental and physical

RFC limitations to specifically address her "subjective findings" and allegations of pain.  In

22

addition to the physical limitations discussed above, the ALJ limited Plaintiff to "work at the unskilled level with minimal changes" to account for "any decreased attention or concentration due to pain or medication side effects." (R. at 22-23.) As the ALJ explained, Plaintiff's "past relevant work was skilled; therefore, the reduction in skill level is significant." (R. at 23.)

In sum, the Court concludes that the ALJ did not violate the treating physician rule or otherwise err in her assessment of Dr. Goldman's opinions. Her RFC is either more restrictive or accommodates the limitations Dr. Goldman opined with the exception of Plaintiff's ability to utilize her upper extremities, for which the ALJ offered good reasons for rejecting. Plaintiff's first contention of error is therefore **OVERRULED**.

## B.    Evaluation of Pain

The ALJ concluded that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her alleged] symptoms [were] not entirely credible." (R. at 20.) In her second contention of error, Plaintiff challenges the ALJ's consideration of her allegations of pain. The Court finds this contention of error to lack merit.

The Sixth Circuit has provided the following guidance in considering an ALJ's credibility assessment:

> Where the symptoms and not the underlying condition form the basis of the disability claim, a two-part analysis is used in evaluating complaints of disabling pain. 20 C.F.R. § 416.929(a); *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001); *Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994). First, the ALJ will ask whether the there is an underlying medically determinable physical impairment that could reasonably be expected to produce the claimant's symptoms. 20 C.F.R. § 416.929(a). Second, if the ALJ finds that such an impairment exists, then he must evaluate the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities. *Id.*

*Rogers*, 486 F.3d at 247.

"The ALJ's assessment of credibility is entitled to great weight and deference, since he [or she] had the opportunity to observe the witness's demeanor." *Infantado v. Astrue*, 263 F. App'x 469, 475 (6th Cir. 2008) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)); *Sullenger v. Comm'r of Soc. Sec.*, 255 F. App'x 988, 995 (6th Cir. 2007) (declining to disturb the ALJ's credibility determination, stating that: "[w]e will not try the case anew, resolve conflicts in the evidence, or decide questions of credibility" (citation omitted)). This deference extends to an ALJ's credibility determinations "with respect to [a claimant's] subjective complaints of pain." *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 652 (6th Cir. 2009) (quoting *Siterlet v. Sec'y of Health & Hum. Servs.*, 823 F.2d 918, 920 (6th Cir.1987)). Despite this deference, "an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Walters*, 127 F.3d at 531. Furthermore, the ALJ's decision on credibility must be "based on a consideration of the entire record." *Rogers*, 486 F.3d at 247 (internal quotation omitted). An ALJ's explanation of his or her credibility decision "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.* at 248; *see also Mason v. Comm'r of Soc. Sec. Admin.*, No. 1:06–CV–1566, 2012 WL 669930, at *10 (N.D. Ohio Feb. 29, 2012) ("While the ALJ's credibility findings 'must be sufficiently specific', *Rogers*, 486 F.3d at 248, the intent behind this standard is to ensure meaningful appellate review.").

"Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters*, 127 F.3d at 531. In addition, the Regulations list a variety of factors an ALJ must consider in evaluating the severity of symptoms, including a claimant's daily activities; the effectiveness of

medication; and treatment other than medication.  20 C.F.R. § 404.1529(c)(3); SSR 96–7p, 1996 WL 374186 (July 2, 1996)[1]; *but see Ewing v. Astrue*, No. 1:10–cv–1792, 2011 WL 3843692, at *9 (N.D. Ohio Aug. 12, 2011) (suggesting that although an ALJ is required to consider such factors, he or she is not required to discuss every factor within the written decision) (Report and Recommendation later adopted).  The Sixth Circuit has held that "even if an ALJ's adverse credibility determination is based partially on invalid reasons, harmless error analysis applies to the determination, and the ALJ's decision will be upheld as long as substantial evidence remains to support it."  *Johnson v. Comm'r of Soc. Sec.*, 535 F. App'x 498, 507 (6th Cir. 2013) (citing *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012)).

Here, the Court finds that the ALJ's detailed discussion amply supplies substantial evidence supporting her credibility finding and that she properly considered the requisite factors in assessing Plaintiff's allegations of pain.  For example, the ALJ included a lengthy and thorough discussion of the record evidence, including the objective medical findings.  *See* 20 C.F.R. § 404.1529(c)(2) (objective medical findings are useful in assessing the intensity and persistence of a claimant's symptoms).  The ALJ also reasonably considered that Plaintiff required and received only conservative treatment and that at times she did not seek treatment or comply with treatment recommendations.  *See* SSR 96–7p, 1996 WL 374186 (July 2, 1996) (in

---

[1]SSR 16-3p, which became effective March 28, 2016, superceded and rescinded SSR 96-7p.  *See* SSR 16-3p, 2016 WL 1119029, at *1.  Because SSR 16-3p does not include explicit language to the contrary, it is not to be applied retroactively.  *See Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208 (1988) ("Retroactivity is not favored in the law.  Thus congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result."); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642 (6th Cir. 2006) ("The Act does not generally give the SSA the power to promulgate retroactive regulations."); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541–42 (6th Cir. 2007) (declining to retroactively apply a

assessing credibility, the adjudicator must consider, among other factors, "[t]he type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms" and "[t]reatment, other than medication, the individual receives or has received"); 20 C.F.R. § 404.1529(c)(3) (same); *See Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x, 719, 727 (6th Cir.2013) (minimal or lack of treatment is valid reason to discount severity); *Despins v. Comm'r of Soc. Sec.*, 257 F. App'x 923, 931 (6th Cir. 2007) ("The ALJ properly considered as relevant the fact that [the claimant's] medical records did not indicate that [claimant] received significant treatment . . . during the relevant time period."); *Sias v. Sec'y of Health & Hum. Servs.*, 861 F.2d 475, 480 (6th Cir. 1988) (discounting the claimant's allegations where he failed to follow prescribed treatment); *cf. Lester v. Soc. Sec. Admin.*, 596 F. App'x 387, 389 (6th Cir. 2015) (concluding that ALJ reasonably discounted a doctor's opined limitations where, among other things, the claimant was receiving conservative treatment).  The ALJ also reasonably considered the record evidence reflecting Plaintiff's activities of daily living.  *See* 20 C.F.R. § 404.1529(c)(3)(i) (daily activities may be useful to assess nature and severity of claimant's symptoms); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004) ("The administrative law judge justifiably considered [the claimant's] ability to conduct daily life activities in the face of his claim of disabling pain.").  Finally, the ALJ relied upon and assigned "great weight" to Dr. Goldman's opinions.  (R. at 22.)  Review of Dr. Goldman's opinions reveal that he, too, found Plaintiff to not be fully credible—despite her allegations on November 12, 2014, that she could not sit for any amount of time without significant pain, Dr. Goldman concluded that she remained able to sit for two-to-three hours at a time if she were permitted to

---

newly effective Social Security Ruling in the absence of language reflecting the Administration's

elevate her leg two or three times over an eight-hour day. (R. at 847.) As discussed above, the ALJ accommodated this limitation with in her RFC assessment.

In sum, the Court finds that the ALJ's assessment of Plaintiff's credibility was based on consideration of the entire record and is supported by substantial evidence. Accordingly, applying the applicable deferential standard of review, the Court concludes that the ALJ's credibility determination was not erroneous. Plaintiff's second contention of error is therefore **OVERRULED.**

**C.     Listing 12.07**

For her final contention of error, Plaintiff maintains that the ALJ erroneously failed to explain why she did not meet or medically equal Listing 12.07.

In determining whether a claimant is disabled, an ALJ must consider whether the claimant's impairments meet Social Security Listing requirements. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the impairment is listed or is medically equivalent to a listed impairment, the claimant is found disabled and benefits are awarded. 20 C.F.R. § 404.1520(d). A claimant's impairment must meet every element of a Listing before the Commissioner may conclude that he or she is disabled. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria."). *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). The claimant shoulders the burden of producing medical evidence that establishes that all of the elements are satisfied. It is not sufficient to come to close to meeting the conditions of a Listing. *See, e.g., Dorton v. Heckler*, 789 F.2d 363, 367 (6th Cir. 1989) (Commissioner's decision affirmed where

---

intent to apply it retroactively).

medical evidence "almost establishes a disability" under Listing). The regulations provide that in making a medical equivalence determination, the Social Security Administration will "consider the opinion given by one or more medical or psychological consultants designated by the Commissioner." 20 C.F.R. § 404.1526(c).

Listing 12 addresses nine specific mental disorders. Every mental disorder addressed in the Listing includes *two* components, a diagnostic component, which consists of a description of the mental disorder; and a severity component, which consists of specific criteria measuring the severity of the identified mental disorder. *See* 20 C.F.R. pt. 404, Subpt. P, App. 1, (A)–(C).

Listing 12.07 addresses somatoform disorders. 20 C.F.R. Pt 404, Subpt. P, App. 1 § 12.07 (West 2016). To satisfy this Listing, Plaintiff must demonstrate that she satisfies both the "A" *and* "B" criteria or alternatively, that she satisfies the "C" criteria of the Listings. Here, Plaintiff does not contend that she meets the requirements of paragraph C in either Listing, but instead that she satisfies the part "B" criteria. Listing 12.07, like the other Listing 12 mental health listings, require a claimant to satisfy paragraph B criteria by showing marked impairment in at least two of the following: (1) activities of daily living; (2) maintaining social functioning; (3) maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. *See* 20 C .F.R. Pt 404, Subpt. P, App. 1 §§ 12.03, 12.06 (West 2016).

According to Plaintiff, the ALJ erred in failing to find that she has marked limitations in *all* three of these areas. She does not, however, challenge the ALJ's determination that she has not experienced any episodes of decompensation. Thus, to satisfy Listing 12.06, Plaintiff must demonstrate that she has marked limitations in *at least two* of the areas. The Court finds that

28

Plaintiff has failed to satisfy this burden.

The criteria in paragraph B "describe[s] impairment-related functional limitations that are incompatible with the ability to do any gainful activity."  20 C.F.R. pt. 404, Subpt. P, App. 1, § 12.00(A) (West 2016).  The term "marked" as it is used under the criteria is not defined by specific quantitative threshold, but is instead evaluated "by the nature and overall degree of interference with function."  *Id.* at § 12.00(C).

### 1.    Activities of Daily Living

With regard to activities of daily living, the regulations provide as follows:

> Activities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office.  In the context of your overall situation, we assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability.  We will determine the extent to which you are capable of initiating and participating in activities independent of supervision or direction.

(*Id.*)

The Court finds that the ALJ's reasonably concluded that Plaintiff failed to satisfy her burden to demonstrate that she has marked restrictions in her activities of daily living.  In reaching this conclusion, the ALJ reasoned as follows:

> In activities of daily living, the claimant has mild restriction.  This finding is consistent with Dr. Hinton's opinion and supported by the medical evidence of record as a whole.  Although she reports that she does not do any cooking or housework, the claimant is independent in self-care and typically presents at medical appointments with good hygiene.  Furthermore, although she is limited in her work around the house, records indicate that she enjoys going out at nights, singing karaoke and playing cards.

(R. at 18.)  In addition, the ALJ also relied upon and opined limitations consistent with the opinion of Dr. Witchard, who explicitly found that Plaintiff "is able to perform ADL's."  (R. at

23-24; R. at 753.)  Plaintiff relies upon her own testimony to rebut the ALJ's finding, but the ALJ found her testimony to be not credible.  In light of the foregoing, the Court finds that substantial evidence supports the ALJ's determination that Plaintiff did not have marked restrictions in her activities of daily living.

### 2.    Social Functioning

For social functioning, the regulations provide as follows:

> Social functioning refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers. You may demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation. You may exhibit strength in social functioning by such things as your ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities. We also need to consider cooperative behaviors, consideration for others, awareness of others' feelings, and social maturity. Social functioning in work situations may involve interactions with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers.

20 C.F.R. pt. 404, Subpt. P, App. 1, § 12.00(C).

The Court finds that the ALJ's reasonably concluded that Plaintiff failed to satisfy her burden to demonstrate that she has marked restrictions in her social functioning.  In reaching this conclusion, the ALJ reasoned as follows:

> In social functioning, [Plaintiff] has moderate difficulties.  This finding is also more restrictive than Dr. Hinton's opinion.  However, the undersigned finds that moderate limitations are warranted based on [Plaintiff's] diagnoses of generalized anxiety disorder, which can make it difficult for her to interact with others. Nevertheless, greater limitations are not warranted, as [Plaintiff] is able to interact with friends and family and otherwise presents cooperatively at medical appointments.

(R. at 18.)

30

Plaintiff relies upon the April 2011 opinion of Dr. LaConsay and also her testimony that her kids have to come into her bed to play games to argue she has marked impairment in social functioning.  The ALJ, however, offered good reasons for not crediting Dr. LaConsay's assessment.  Further, as discussed above, the ALJ found Plaintiff's testimony not credible.  Regardless, Plaintiff testified that she did not leave her bed due to pain, not because of social anxiety.

In sum, based upon the foregoing, the Undersigned concludes that the ALJ reasonably concluded that Plaintiff did not have marked restrictions in her social functioning.

Because Plaintiff must demonstrate that she has marked restrictions in *two* of the three areas identified in the paragraph B criteria, this finding requires the conclusion that she failed to satisfy Listing 12.07.  Nevertheless, the Court will consider whether the ALJ erred in assessing Plaintiff's level of impairment with regard to her concentration, persistence, and pace as an alternative basis for concluding that her sole contention of error should be overruled.

### 3.     Concentration, Persistence, or Pace

"Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(3).

The Court finds that the ALJ reasonably concluded that Plaintiff failed to satisfy her burden to demonstrate that she has marked restrictions in her ability to maintain concentration, persistence, or pace.  In reaching this conclusion, the ALJ reasoned as follows:

> With regard to concentration, persistence or pace, the claimant has moderate difficulties.  This finding is also more restrictive than Dr. Hinton's opinion.  However, the undersigned finds that the claimant's major depressive disorder,

dysthymia, generalized anxiety disorder, and conversion disorder may interfere with her ability to focus and handle stress. Regardless, greater limitations are not warranted, as findings on mental status examination indicate intellectual functioning in the average range, and the claimant's function report indicates no difficulty following instructions and the ability to pay attention for "a long time." Furthermore, the claimant is able to maintain adequate focus for daily activities such as reading and watching television.

(R. at 18.)

The Court finds that the record evidence the ALJ relies upon constitutes substantial evidence in support of her determination. Plaintiff disagrees and again relies upon the April 2011 opinion of Dr. LaConsay and also her testimony that she has to read a page four times to understand what she has read. But as discussed above, the ALJ has offered good reasons for declining to credit her testimony and Dr. LaConasay's assessment.

In sum, based upon the foregoing, the Undersigned concludes that the ALJ reasonably concluded that Plaintiff did not have marked restrictions in her ability to maintain concentration, persistence, or pace. Plaintiff's final contention of error is therefore **OVERRULED.**

## VII.    DISPOSITION

In sum, from a review of the record as a whole, the Court concludes that substantial evidence supports the ALJ's decision denying benefits. Accordingly, Plaintiff's Statement of Errors is **OVERRULE**, and the Commissioner of Social Security's decision is **AFFIRMED**.

**IT IS SO ORDERED.**


Date:  March 31, 2017                          *s/ Elizabeth A. Preston Deavers* _____
                                               ELIZABETH A. PRESTON DEAVERS
                                               UNITED STATES MAGISTRATE JUDGE

32